Council, please come to the podium and identify yourself for the record. Good morning. My name is Edward Hise. I represent myself pro se. My brother Joseph is also pro se. And Mr. Steven Sturgeon represents the corporation Digital Oversharing. All right. And you have agreed among yourselves to share your time. Three minutes for yourself, three minutes for Joseph Hise, and then four minutes for Mr. Sturgeon. Is that correct? Yes, Your Honor. And five minutes for rebuttal. No. Oh, excuse me. Excuse me. A total of 15 minutes. Very well. Thank you, sir. Very well. Excuse me. You may proceed. Thank you. In understanding this case, I believe it's important to know a little bit about us and our situation. I'm an everyday average person, I believe, who worked hard and put myself through school and earned a marketing degree. I'm a certified webmaster. My wife is an elementary school teacher. We have two kids that keep us busy. They're very young. And I respectfully suggest and sincerely believe that we have a genuine reason to understand the grounds that we own our property of 10 years because of the World Intellectual Property Organization. What use did you make of the GoPets name, the name that you registered? At the time I registered it, I was in school at UCSB. What use did you make? We had a limited amount of time, and this is our time. We want to focus attention on what's going to matter. What use did you make of that name? In 1999, we made the use of pet and veterinarian-related services, which we submitted publicly to the class and to others. We had pet insurance services for cats and dogs, a service listed for missing or lost pets, information for news services for topics such as vaccination, spay and neutering. All this was prior to a trademark. We had information for First Aid for pets. We had information for Guide Dogs to the Blind, which we have a special – my cousin, who works with a pet company and for many veterinarians, has a special union and tie with Guide Dogs to the Blind. Some of the veterinarians that she worked with, such as Dr. Novi and Dr. Goldstein, have volunteered services for our site. In addition to that, we posted a listing of wellness and prevention of pet care and pet clinics. And we also had the service of listing for medical information and medicine for products that were available for pets. We also had information for pet adoptions. Can I interrupt you for just a minute? Where is it in the record in front of us that you did all this before your adversary registered its name? Thank you, Your Honor. It's on the record in the brief, I believe, and the response brief. Also, I submitted my own pro se brief, and it's in that. Well, here's some of the difficulty of being pro se. A brief isn't evidence. Do you have evidence that you put in the record in some form? Yes, Your Honor. That evidence was produced at the lower court. We also submitted it in Docket 183 in accordance with Rule 56C. And that information, we submitted over 135 arguments that we believe were never properly assessed. But again, arguments are not evidence. I want evidence. The evidence that accompanied those arguments, that's where this information was placed. And we provided about 200 or 300 documents of the actual evidence that I'm referring to, Your Honor. Okay. And where can I find that? You're going to find that in Docket 183 and 198. Apparently, there was some kind of confusion in Ashley's submission, but that was corrected in errata by our attorney, Mr. Steven Stern, who represented the corporation. Thank you, Counsel. Your time has expired. We'll hear now from Mr. Joseph Heiss. Thank you. Yes, Your Honors. Thank you for letting me speak. I'm Joseph Heiss representing myself pro se. I would also like to reiterate to this Court that my brother and I have always had every good faith, intent, and belief that we could run our business. There were numerous genuine issues of material fact that did not get covered in the lower district court, as well as outright errors in the summary order itself that we believe rendered this summary order inoperable, and we believe that we're entitled to a jury trial. One point of notable mention is the measure by which the district judge did a comparison. The district judge supposedly compared our website, which is a single-page website, that said that our website is coming soon because it's always in development, as websites are, versus GO-PET's LTD's website, which was five years after ours, essentially. And the judge said, based on similar appearance, that we may have given the impression that we were to copy their game site. The problem is, is that the plaintiff never once submitted any graphical depiction whatsoever of their game site, so the judge couldn't have come to that comparison essentially fairly. So there's issues like that that really stand out, as well, that the plaintiff here knew in advance that we were operating appropriately. Also, there are some unclean hands issues that have been brought up. The plaintiff's client basically went and deceived the World Intellectual Property Organization in an attempt to steal our domain before the district court issue complaint was brought up. They submitted fraudulent information, claiming they had a trademark, when they did not. And had they succeeded at Michael, they would have been able to take our domain away from us. So there's issues like that that basically stand out. In addition, one of the arguments that plaintiff brings up is user confusion. And they say that their users were confused by our website, which is ludicrous. And one way that it is incontrovertible, and this has been an issue, is that the judge issued an injunction, a preliminary injunction in 2007. The injunction forbid us, the defendants, from even using the term gopets.com on our own gopets.com website. And essentially, he made us, he put two links, required us two links to their website. Therefore, and we took all of our business down, the only business that it represented, we had to point to the plaintiff's website. Essentially, that ended all user issues, and genuine issues could not be. I have one very uncomfortable statement that I have to make. And I regretfully do, but I'm running out of time. Regretfully, the defendants are put in the inevitable position to report that judicial misconduct, including counsel Fierstein's admission of having an influence or relationship with Judge Maths for this case. Judge who? Which judge? Judge Maths, Your Honor. It's very unfortunate. And we have submitted a docket number 30 at this appellate court laden with evidence and information. And to date, this has not been refuted by plaintiff. Thank you. Thank you, counsel. Your time has expired. Mr. Sturgeon. May it please the court, I'm Steve Sturgeon, counsel for the defendant, the judicial overture in this proceeding. I'd like to emphasize three issues that I think are important. One is, we are taking the position that the defendant fell within the safe harbor provision of the ACPA. We suggest that the plaintiff acted with unclean hands, which would be a barge of equitable relief. And we suggest that the court erred when it awarded attorney fees in this situation, because we suggest that the defendant did not act in a malicious, fraudulent, willful manner. Okay. Now, we have two claims here. We've got the Lanham Act claim and we also have the ACPA claim, correct? What's your contention on the Lanham Act? Isn't it infringing when the text was put on the site after 2006? We suggest, Your Honor, that it was extraordinarily minor. I believe that the term Gopetz was listed on the website, gopetz.com. There were some paw prints. Our position is that that really doesn't constitute infringement, that we justify this. What about the argument that assigning the name to the corporation from the two individuals was a re-registration? Yes, Your Honor, I think that is important. The domain name was registered before the ACPA was enacted. The plaintiff is arguing that there was a transfer to a corporation. Our position, and it's substantiated in the documentation, is that the domain name for the entire period of time was owned by the proprietorship of the defendants, and they changed the corporate entity. There was a change of the name listed on the network solutions registration. We suggest that that is not the type of registration that would call into effect the ACPA. Okay, your words slid around there for just a moment. Yes. You said changed the corporate entity. Was there ever a previous corporate entity? There was not. So it went from two individual owners, and they then assigned it to the corporation, of which they are the sole shareholders? Well, yes, and we have documentation. That was a hesitation. Where's the hesitation coming from? We have evidence from the accountant that for the entire period of time, Digital Overture, the proprietorship, did own the domain name. The registration listed pies, no first name, just pies initially. Then at the key time, there was a change on the registration form with the network solutions, Okay, now what's the proprietorship? What's the legal status of that? It was not a corporation. It was a proprietorship. And what do you mean by a proprietorship? It was owned entirely by a partnership. So they were operating as partners, and the partnership owned it, and then the partnership, in your view, assigned it to the corporation. And in your view, an assignment from one owner to the other is not a reregistration? Well, for purposes of the harsh provisions of ACPA, it would suggest that that registration would not, in and of itself, cause the dependents to be subject to these remedies that are listed for that. Counsel, you may have an appealing argument with respect to the individuals, but as to the corporation, that clearly was a registration. The corporation registered in 2006, did it not? Yes, it did, I understand. Well, what do you mean by registration? I mean, that's the thing. If you have a change of ownership of a domain name, which is what we clearly had from the partnership to the corporation. Yes. Well, I guess I'll ask your adversary, and I'll work on him for a minute, and we'll deal with this on a rebuttal then. Yeah, okay. All right. Thank you, Counsel. Your time has expired. I say that in terms of your initial time, but you have, as a group, reserved five minutes for rebuttal. Excuse me. May it please the Court? Robert Horne of Roskow. Mr. Horne. The plaintiff. This is a paraphrenetic case of a cyber squadron. After reviewing the record in preparation for this hearing and the district court's granting a summary judgment, I found it difficult to come up with any issue that needs clarification. Well, it may not be the paradigm if only because the first registration precedes the statute. Yes, but there are several cases that have addressed this. There's the Schmidt-Heine case, and there's also, I'd like to direct the Court's attention to a more recent case that was decided in the District of Nevada, and it is Ricks v. V. M. E. Zine, and it was decided on July 26th of 2010. And every court that has addressed this issue has found that the word registration in the statute means what it says. It means registration. It's not qualified in any way. That doesn't help me when you say registration means registration. The question is, what happened here? Let me ask it this way. Sure. Assume for a moment that there had never been any change of ownership from the original registration, either in the name of these individuals or their partnership. Would there be a violation of the Cyber Squadron Act? No, I don't believe so. So in your view, the only reason we have a violation of the Cyber Squadron Act is that there's a change of ownership from the partnership wholly owned by these two individuals to the corporation wholly owned by these two individuals. Yes, well, that brings it within the purview of the Act. It's not the only reason there's a violation. There was a violation to the fact that they demanded $5 million. I mean, that's what constitutes a violation. No, no, wait a minute. I think I heard you say, and I'm not trying to trap you. I just want to make sure I understand what you're saying. If they had never reassigned it and they were in compliance with the statute, would it be a violation of the statute that they asked a price that your client was unwilling to pay, whether $5 million or $25 million? I don't believe so. So the fact that they asked $5 million, that's really off to one side. The central issue is the one that we started with, did it change character because of the assignment from the partnership to the corporation? Yes. If that's the proper reading of the statute, that means that anyone having a domain name that's properly registered to them has an inalienable asset. Isn't that right? Well, no. Well, all they have is the domain name. Well, the domain name is an asset. I mean, it's worth money. Your client actually wasn't willing to pay $4 million. He was willing to pay, what, $40,000 at some point. I mean, that's clearly worth money. Yes, and it was that problem that Congress was attempting to address with the statute. But what I'm after is I have trouble reading any statute that sets up an interest in property, which this clearly is. I mean, it's worth money. You can see that so long as they've not changed the owner of it, they were entitled to ask you whatever they wanted to ask, and you can pay or not pay or whatever it is. But your argument means that that asset is inalienable, that they simply can't sell it to somebody else. That's a very odd form of property, which is why I'm having trouble with this argument. There are other things that they've got trouble with. I mean, the Lanham Act, I mean, that's a different question. I'm asking only as to the Cybersquad. I think it would be, when you say property, all they own is this domain name. Correct. And it's worth some money because you were willing to offer $40,000 for it, and you concede that that was a proper demand so long as they owned it in the original form of ownership. Yeah. I wouldn't say that it was proper. I would say it doesn't come under the purview of the Act. Well, proper, not illegal. I understand you don't like it. Right. It wasn't illegal. That's why Congress passed the Act, to make it illegal. But you're suggesting that, in fact, Congress reached back into the past because any re-registration, what can they do with this name other than develop it itself? You're saying they can't assign it. They can't sell it to anybody else because the re-registration counts as an initial registration. Right. The Act says if you register in bad faith, that's a violation of the Act. And I think the context here is the same. But if it's purely registered in bad faith, is an assignment from a partnership to a corporation owned by the partners itself a registration in bad faith? It was here because they sent that letter asking for $5 million in December of 2006. Yeah, but focus on the registration. And I'm not sure what it is about. The registration happened at the same time. They transferred this simultaneously with demanding the $5 million. But they could demand the $5 million without the re-registration. And, in fact, did. It wasn't the re-registration that enabled their demand. They could do that based on their initial ownership from the pre-statute registration. Yes. I don't see how the re-registration can be brought into this by alleging the re-registration was in bad faith because the re-registration was an assignment from partnership to corporation. It didn't activate a claim or a demand or anything against your client. Well, yes. They re-registered the name after knowledge that the mark was owned by my client, by the plaintiff. Did the re-registration strengthen their position at all? I believe it did. How? Because the application for the registration had occurred two years earlier. And the defendants were aware of that application. And they didn't challenge the application before the USPTO. And the mark was then registered two years later by the USPTO in November of 2006. And after that, that's when the plaintiffs, after negotiations, demands going back and forth, then demanded $5 million and re-registered. The domain name. And they re-registered at that time. Counsel, suppose they sold the name to a stranger, not to a corporation controlled by them. Who registers at that time? Is it the new corporation? Yes. Okay. Well, isn't that exactly what happened here? In other words, we have individuals who held the registration from the beginning. One individual. Well, all right. Let's say the one individual. But when the new registration occurred in 2006, that was a registration by the corporation. So you've got the two separate entities here. Do you know? Well, it was transferred, yes. It was transferred by Mr. Edward Heise to the Heise's company, Digital Overture. Okay. But as to the statute now, not the Lanham Act, but to this ACPA statute, the problem is that if they registered in the face of a trademark, that is actionable under the statute. No? Yes. If they did it for the purpose of obtaining profit. Okay. But isn't exactly, can't we separate out the individual from the corporation? Because a good argument can be made, it seems to me, and we've heard the argument,  But the only thing that happened in 2006 with respect to this issue was the filing by the corporation. So perhaps the corporation is liable, but the individual is not. Is that a possible outcome here or not? Well, it may be a possible outcome, but I don't think it's the correct outcome for two reasons. Number one is I believe the court needs to consider the Lanham Act claim separately, the trademark infringement. Yeah, I'm putting that to the side. Putting that aside. But if the court looks at the letter that was written, the $5 million demand letter, it was signed by both Mr. Heise and by Mr. Edward Heise and Mr. Joseph Heise. So they were intimately involved in doing this. They're the ones who wrote that letter and signed the letter. Let me ask you this. I understand that the original registration of the domain name was done before the passage of the statute. But assume for a moment that the statute was in effect at the time they registered the domain name, gopets.com, and that your company is not in existence at that time. Your company then comes into existence with the business it has. Is that cyber-squatting for them to have that domain name that they registered after the existence of the statute? Yes, if they attempt to sell it for profit, yes. Because? That's the definition of the statute. Well, but wait a minute. But they had no notion that you even existed because you didn't exist at the time of registration of the name. It's the hypothetical. Okay. So you're saying that if it wasn't registered in bad faith at the time. Well, and I guess part of this is the definition of bad faith. Take these facts. The statute exists. They then register the domain name gopets.com. Your client doesn't exist at that time. Two years later, your client creates its business. And your client comes to them saying, you've registered this domain name. We like it. And they say, well, fine, let's talk about money. Have they violated the statute? Again, I don't believe so because the Act talks about registering in bad faith. So, again, the problem really isn't anything having to do with the fact when the statute came into effect. The only issue is what's the consequence of them transferring ownership from the partnership to the corporation? Yes. Well, except that there was a registration when they knew that my clients owned the mark and had a business. And by registration, you mean when the corporation says, we now own the gopets.com. That's correct. And so the real question was that. Would the clients be liable for that? Yes. On what basis? On the basis that they're the ones who controlled that corporation. Well, stop right there. It's not the rule of law that shareholders are liable for what a corporation does. But they're the ones who wrote the letter that demanded the $5 million. They're the ones who, after the $5 million wasn't paid, put metatags, not the corporation. They put metatags into the website in order to confuse users. They took a lot of actions individually afterwards that would make them liable. Are you saying we should pierce the corporate veil? Is that what you're arguing? Well, I will say that there was no evidence of that, and that was not an issue in summary judgment. No, I'm asking you now, would your theory of if the wrongful act is the registration by the corporation. Yes. But you say, nonetheless, the owners of the corporation are responsible in damages. Are you doing this on the theory of piercing the corporate veil? Yes, but there's also, I believe there is some case law where a corporation engages in wrongful conduct and the executives knowingly engage in tortious conduct, that they can be personally liable. I know that that's correct under California state law. In other words, it doesn't require a piercing of the veil. Correct, correct. The award here was under the statute, wasn't it? The ACPA, whatever. Is the acronym correct? I think it was under both, because the Lanham Act and the ACPA are all part of the same statute. Which leads me to the jury. I'm sorry. The damages provision for both is, I think, 117 IP. Which is the same for both. It was statutory. There wasn't a cause of action or the summary judgment or the district court did not turn on some tortious interference or California state law claim or anything else. It was statutory, yes, Your Honor. Which leads me to the jury question issue here. Isn't the defendant entitled to a jury trial with respect to the $100,000 damage award on the theory that this was essentially copyright under common law? No, Your Honor, for two reasons. Number one, it wasn't a copyright case, and we did cite in our brief, I know it was two cases, where the damages under the ACPA were awarded on summary judgment when you have undisputed facts. Even in that situation, you're not entitled to a jury. But the award under the ACPA was up to, and you got the maximum, right? No, actually, we didn't. Well, we got the maximum on just one of the 19 domain names. Right. And the minimum on all the rest. The minimum or 1,000 on the other 18. Yes. But what I'm asking, and I'm kind of following along on Judge O'Scanlon's question is, once you move above the minimum, even if the facts are undisputed, it may be that the jury would have some reason to assess higher or lower damages. And wouldn't that be a jury question? I don't believe so, Your Honor. When the facts are undisputed, they did not present any facts. And also, they didn't challenge that, the amount of the award on the appeal. That is not an issue that they appealed for. They didn't raise the jury trial question? They did not challenge the amount of damages. That's not my question. They did not challenge that it should have been decided by a jury? My understanding is that they wanted a jury, or they say that they're calling the jury on the issue of their good faith. Because the only evidence they presented in opposition to the Sotomayor judge motion was their statements that we acted in good faith, and they said that that raised a probable issue of fact. But if you look at their appellate brief, they did not challenge or raise as an issue the amount of damages that the court awarded. But I think good faith, or the degree of bad faith, would go into the question as to whether or not minimum damages are awarded or some higher amount, wouldn't you think? But there was no dispute on the issue of good faith in terms of the facts. Although they said, self-serving statements, we acted in good faith, the undisputed evidence was the fact that they demanded the $5 million, that they put in the metatags, that they acknowledged that there was that consumer confusion. They posted the GO-PETS mark on the website. I mean, all of that, in terms of the safe harbor, by the way, in the ACPA, if you demand money, then that's bad faith as a matter of law. There is no exception. Thank you, counsel. Your time has expired. Mr. Sturgeon, you have five minutes total. Thank you. I have a question that I think is very relevant to this last argument, and that is, did you preserve the jury question, the right to a jury on the damages question in this case? Yes, Your Honor. And where would I find that? Maybe Mr. Sturgeon can help you on that. Mr. Sturgeon submitted information after the hearing in July of 2008. I believe he did. But in any event, this is very important that I put this on the record. First, we never demanded $5 million. In November of 2006, their CEO told us in writing twice he was abandoning the term GO-PETS, so therefore there's no trademark to infringe on. Additionally, he contacted me and called me and said, please let me try to buy that name. Now, keep in mind, he just tried to steal our name through WIPO by putting fraudulent information. I didn't want to sell the name. He said, please, please. If you read that letter, in the letter, first of all, we also say digital overture owns the domain. There's no discrepancy there. Secondly, since he asked us for that letter twice, it cannot possibly be considered a demand. This is very important. WIPO ruled in 2006 that GO-PETS.com, our name. You're off on a tangent, so you're wasting time. But I have to stop you there. The effort to characterize your request for $5 million as simply being a response to his inquiry is belied by what strikes me as the extortion threat that you're going to send it to the investors of GO-PETS. You can argue all you want. You're going to have a hard time persuading me on that one, and I can say it's a tangent. The reason why we didn't want to go through Mr. Bethke is he just tried to steal our name through fraud. We wanted to go through Liberty Media, more reasonable, sound, professional people. In addition to that, at WIPO's ruling, this is essential, they ruled that GO-PETS.com was owned by us and that it's identical, for legal purposes, to the term GO-PETS. GO-PETS had not received a trademark at that time for this, which means continuance of a trademark means their trademark is completely invalid. They knew at the time that WIPO ruled we own that name, and it was identical to the term they were only in application of. In addition to that, Mr. Bethke said he was abandoning the name twice. In addition to that, he wrote us in 2004, you own the domain. This is before he formed his corporation, before he even applied for a trademark, before he put his game online. It's clear. This guy, he wrote a book, even in 2003, telling others how to avoid trademark infringement. He knew exactly what he was doing, and we never demanded that. Thank you, counsel. Mr. Weiss. Joseph Weiss, Pro Se once again. Also, I would like to contest that we never raised the amount issue. One point that we certainly did bring up, this is about the 18 complementary domains. In the summary order itself, Judge Matt states there is no evidence that these 18 domains ever had any information on them or ever caused any harm, yet he awarded that we turn these domain names over to the plaintiff and got fined for each and every one of them. Since no evidence was ever produced on these things, and in fact, admittedly, by evidence, by discovery, we found out from plaintiff, they didn't even know these 18 domains existed until a year after the proceedings began, then we certainly have a contestment about the dollar amount when we were getting fined and penalized for having done nothing with these 18 domains. Also, I think it's a, even if you do consider the ACPA arguments brought by plaintiff, you have to consider the safe harbor provision, which says if defendants believe that they had any good intentional reason to run their domain, then they qualify for that. We should hear the reasons for that. I hate to interrupt, but I'd like to talk to your lawyer for a minute. Yeah. Absolutely. I suggest you let him have the rest of your time. Mr. Heiss, please. Thank you. Counsel, you understand our issue. Yes. Where can we find that? With respect to the ---- Preserving the jury, right to trial. On page 42 of the appellate brief, I question the award of damages to the plaintiff without jury determination, and with respect to the attorney fees on page 44, I suggest that the district court erred in the determination of attorney fees because we suggest that there was not sufficiently egregious and malicious conduct on the part of the defendant. Okay. Can I ask you a question as to what case law exists on the question as to whether or not a change of ownership of a domain name constitutes a re-registration, and therefore the equivalent of an original registration under the Cyber-Squatting Act? I don't have any citation immediately at hand. I'd be pleased to provide something. Is there any case law one way or the other on the point? My impression is this is an unresolved issue in the law. It is. It's been an issue within the domain name law for some time. And I'd like to further add, with respect to the question of registration, re-registration, I make reference to page 43 of the declaration that was submitted pursuant to Section 56C of the Federal Rules of Civil Procedure. We have several references in there with respect to the definition of registration. Actually, the domain name website of Network Solutions says that there are different definitions that are used in different places for different purposes by different entities. I just simply refer to that as support for the suggestion that this change of the word that would not be sufficiently significant to bring into effect the severe penalties. One further question. With respect to what happened in 2006, the transfer of ownership, was that a registration by the corporation? Was it a re-registration by the original owners? How do you characterize that? What happened? As a matter of law, I should say. I know. As a practical matter, there was simply a request made to Network Solutions to change the name in the registration template. As a matter of law, we would suggest that the partnership change the name. With respect to the piercing of the corporate bail suggestion, we would suggest that the same ownership, interest, the same title, the same rights that existed previous to the quote-unquote registration existed subsequently to the registration. There was a time some years ago that American Express was run as a partnership, and American Express then changed its corporate form to a corporation. Now, if they were owners of domain names back in those days, it sounds as though the plaintiff's theory is that simply the change of the form of doing business of American Express from partnership to corporation would mean that every domain name they owned would constitute a brand new registration. Yes, Your Honor. I agree with that. And I think that that's a fallacious argument on the part of the plaintiff. I would also mention that the – I would suggest that the purpose of the term registration for the ACPA was directed towards the initial registration by a blatant cyber squad of a domain name like Coca-Cola.com that was occurring prior to the ACPA. Right. I want to understand that. Thank you. Thank you, Counsel. The case just argued will be submitted for decision. And we'll hear argument next in United States v. Herrera.
judges: O'scannlain, Fletcher W. , Clifton